# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C.K. | : | NO. 4:15-cv-00280-MWB |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION - LAW** |
| HOPE WRYE, | : | |
| in her individual capacity, | : | |
| CENTRAL INTERMEDIATE | : | |
| UNIT #10, and PHILIPSBURG- | : | |
| OSCEOLA AREA SCHOOL | : | |
| DISTRICT | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendants** | : | |

---

### PLAINTIFF C.K.'S BRIEF IN OPPOSITION TO CENTRAL INTERMEDIATE UNIT #10'S AND PHILIPSBURG-OSCEOLA AREA SCHOOL DISTRICT'S MOTIONS FOR SUMMARY JUDGMENT

---

Benjamin D. Andreozzi, Esq.

Nathaniel L. Foote, Esq.

**ANDREOZZI & ASSOCIATES, P.C.**

111 North Front Street, Harrisburg, PA 17101

717.525.9124 (Phone) | 717.525.9143 (Fax)

*Counsel for Plaintiff, C.K.*

## <u>TABLE OF CONTENTS</u>

PROCEDURAL HISTORY……………………………..………………………....5

FACTS………………………………………………………………………..6

QUESTIONS PRESENTED…………………………………………………...10

STANDARD OF REVIEW……………………………………………………10

ARGUMENT………………………………………………………………...11

    a.    CIU and POASD violated Title IX by exhibiting deliberate indifference in the face of actual notice regarding sexual misconduct by Hope Wrye…………………………………………………11

        1.    Hope Wrye's sexual relationship with C.K. was discrimination on the basis of sex under Title IX……………………………12

        2.    Hope Wrye's sexual abuse of C.K. was "severe, pervasive, and objectively offensive" discrimination on the basis of sex under Title IX…………………………………………………..13

        3.    CIU and POASD had "actual notice" of Hope Wrye's intimate relationship with C.K…………………………………………16

        4.    CIU and POASD exhibited deliberate indifference in the face of actual notice of Hope Wrye's sexual misconduct……………19

    b.    C.K.'s Section 1983 claim should proceed because POASD had a practice of not reporting criminal conduct at the High School out of fear that it would reflect poorly on the school's emotional support program, which allowed Hope Wrye's abuse of C.K. to continue……...…………………………………………………22

CONCLUSION………………………………………………………...24

# TABLE OF AUTHORITIES

## CASES

*Bostic v. Smyrna School Dist*., 418 F.3d 355 (3d Cir. 2005)…………….12, 16, 18

*Chancellor v. Pottsgrove Sch. Dist*., 529 F. Supp. 2d 571 (E.D. Pa. 2008)…14, 16

*Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695 (E.D. Pa. 2007)…11, 21

*Davis v. Monroe County Bd. of Ed*., 526 U.S. 629 (1999)…………………..14, 19

*Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57 (D. Me. 1999)……………13

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)………………..11

*Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998)………………………11

*Groman v. Township of Manalapan*, 47 F.3d 628 (3d Cir. 1995)………………10

*King v. Conroe Ind. Sch. Dist*., 2005 WL 1667803 (S.D. Tex. July 15, 2005)…...13

*Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442 (M.D. Pa. 2016)……...14

*P.H. v. Soh. Dist. of Kansas City*, 265 F.3d 653 (8th Cir. 2001)…….…………13

*Swanger v. Warrior Run Sch. Dist.*, No. 4:11-CV-S94 (M.D. Pa. 2015)…………16

*Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720 (3d Cir. 1989)……….22, 23

*Warren ex rel. Good v. Reading Sch. Dist*., 278 F. 3d 163 (3d Cir. 2002)…..11, 18

## STATUTES

Title IX, 20 U.S. Code § 1681………………………………………………….11

42 U.S. Code § 1983……………………………………………………………22

18 Pa.C.S. § 3122.1(b)…………………………………………………………15

18 Pa.C.S. § 3123(a)(7)…………………………………………………………...15

18 Pa.C.S. § 3124.2(a.2)…………………………………………………………..15

18 Pa.C.S. § 3125(a)(8)…………………………………………………………...15

18 Pa.C.S. § 3126(a)(8)…………………………………………………………...15

**FEDERAL RULES**

Fed.R.Civ.P. 56(c)………………………………………………………………...10

AND NOW, comes the Plaintiff, C.K., by counsel, Andreozzi & Associates, P.C., who hereby files the within Brief in Opposition to Central Intermediate Unit #10's and Philipsburg-Osceola Area School District's Motions for Summary Judgment, and states as follows:

## I.      Procedural History

The Plaintiff, C.K., initiated this action on February 9, 2015 by filing his Complaint against the Defendants, Central Intermediate Unit #10 ("CIU") and Philipsburg-Osceola School District ("POASD").   (Doc. 1).   C.K. filed an Amended Complaint on April 16, 2015 (Doc. 24), and a Second Amended Complaint on October 9, 2015.  (Doc. 38).  The Defendants filed several Motions to Dismiss C.K.'s Complaints, which this Court denied.  (*See* Docs. 22, 28, 39, 41, 44-45).

Since then, the parties have conducted extensive discovery, which closed December 6, 2016.  (Doc. 58).  Now, POASD and CIU have filed Motions for Summary Judgment seeking dismissal of Plaintiff C.K.'s Title IX and Section 1983 claims against both institutions.   CIU also seeks dismissal of C.K.'s punitive damages claim against it.  (Docs. 59, 61).

C.K. opposes CIU and POASD's Motions for Summary Judgment on his Title IX claims against both CIU and POASD, and his Section 1983 claim against

POASD.  C.K., however, does not oppose CIU's Motion for Summary Judgment on his Section 1983 and punitive damages claims.

## II.   Facts[1]

In 2000, C.K. began ninth grade at Philipsburg-Osceola Area High School (the "High School").  (C.K. Statement ¶ 1).  When C.K. began school that year, he was assigned to an emotional support class taught by Larry Krest.  (*Id.* ¶ 5).  At the time, Hope Wrye was Mr. Krest's teacher's assistant.  (*Id.* ¶ 8).  Mr. Krest and Ms. Wrye were both employed by CIU, and assigned to the High School.  (*Id.* ¶¶ 7-11).  When school started, Ms. Wrye was thirty one (31) years old.  (*Id.* ¶ 21).  C.K. was fifteen (15) years old.  (*Id.* ¶ 20).

That school year, Ms. Wrye began an illegal, sexual relationship with C.K. (*Id.* ¶¶ 15-23).

Ms. Wrye started kissing C.K. that winter when C.K. was a student at POASD.  (*Id.* ¶¶ 17-19).  Then, in February 2001, C.K. transferred from POASD to the State College School District.  (*Id.* ¶ 2).  After C.K. moved, Ms. Wrye would babysit C.K. and his siblings.  (*Id.* ¶ 48).  During this period, C.K.'s brother, sister, and mother noticed inappropriate behavior on Ms. Wrye's part toward C.K.  (*Id.* ¶¶ 44-64).  For example, Dustin K., C.K.'s brother, saw Ms. Wrye kiss C.K.

---

[1]     Plaintiff C.K.'s Counterstatement of Material Facts is incorporated by reference.  Key facts, however, are restated here for the Court's convenience.

between five and ten times while they attended school in State College.  (*Id*. ¶¶ 57-58).

On April 1, 2001, Ms. Wrye had sex with C.K. for the first time.  (*Id*. ¶ 20).[2] On that date, C.K. was then fifteen (15) years old, and Ms. Wrye was thirty-two (32).  (*Id*. ¶¶ 20, 21).  Ms. Wrye was also still employed by CIU, and stationed at the High School in Mr. Krest's classroom.  (*Id*. ¶¶ 10-11).

In November 2001, C.K. transferred from State College back to POASD and resumed attending the High School.  (*Id*. ¶ 3).  C.K. once again had Ms. Wrye as his teacher's assistant.  (*Id*. ¶¶ 12-13).  After C.K. returned to the High School, Ms. Wrye continued to have sex with him.  (*Id*. ¶ 22).

The next school year, Ms. Wrye was transferred to an elementary school because they did away with Mr. Krest's classroom at the High School.  (*Id*. ¶¶ 14, 118).  That October (2002), C.K., who was then a junior, dropped out of school. (*Id*. ¶ 128).  C.K. left high school because he "felt as I was being - - - felt like I was pressured to drop out because I was afraid Hope was going to get in trouble because of what was going on . . . And I felt like she wanted me to grow up before my time, so that's why I dropped out."  (*Id*. ¶ 129).  Shortly after he dropped out,

---

[2]     Ms. Wrye denies she had sex with C.K. until after he dropped out of school. (CIU Statement ¶ 17).  When Ms. Wrye and C.K.'s sexual relationship started is obviously a key issue in this case.  This factual dispute clearly indicates why this case is inappropriate for summary judgment.  Furthermore, for purposes of summary judgment, this Court must assume C.K.'s version is accurate.

Ms. Wrye became pregnant with C.K.'s child. (*Id*. ¶ 131). She resigned from CIU in March 2003 because she was ashamed to be pregnant by C.K. (*Id*. ¶ 133).

Prior to C.K. leaving school or Ms. Wrye's resignation, POASD and CIU employees became aware of allegations that Ms. Wrye behaved inappropriately with C.K. (*Id*. ¶ 89). POASD and CIU officials did almost nothing in response to this information.

Barbara Neff, a High School cafeteria employee, lived next door to Ms. Wrye in 2000–2002. (*Id*. ¶¶ 32-33). While C.K. was a student at the High School Ms. Neff would routinely see C.K. at Ms. Wrye's home. (*Id*. ¶¶ 34-35). When C.K. was at Ms. Wrye's home, Ms. Neff saw intimate contact between Ms. Wrye and C.K. including "passionate kissing." (*Id*. ¶¶ 39-40).

According to CIU, Ms. Neff reported her concerns to Gary Springer, the High School's special education supervisor. (*Id*. ¶¶ 70-71, 80). Sometime in 2000–2002, Mr. Springer contacted Dennis Shanafelt, CIU assistant executive director, and relayed to Mr. Shanafelt "there were rumors that there was an issue between Hope and . . . [C.K.]" so they needed to meet with Chuck Young, the High School principal. (*Id*. ¶¶ 79, 89).

Mr. Shanafelt took Kerri Bloom, a female CIU administrator, and told her they needed her to attend the meeting "because she's a lady." (*Id*. ¶¶ 95, 96). Mr. Shanafelt, Ms. Bloom, and Mr. Young then met with Ms. Wrye at the High School.

(*Id*. ¶¶ 79–98).  During the meeting, Ms. Wrye was accused of "kissing a student" or "having an affair with one of her students," or both.  (*Id*. ¶¶ 97–98).  Ms. Wrye was told the allegations were made by a "female cafeteria worker" that "lived close to her."  (*Id*. ¶¶ 68–69).  Ms. Wrye recalls this as "the Barb Neff allegation thing." (*Id*. ¶ 72).

After the meeting, it was determined that Ms. Wrye was going to be reassigned to another classroom.  (*Id*. ¶ 99).  It is now undisputed that Ms. Wrye's transfer to another classroom never occurred.  (*Id*. ¶¶ 100-101).

Mr. Young then questioned Larry Krest, who denied knowledge of wrongdoing on Ms. Wrye's part.  (*Id*. ¶¶ 108-109).

Nothing was done by CIU or POASD beyond speaking with Ms. Wrye and Mr. Krest.  (*Id*. ¶ 110).  No one spoke to C.K. about the allegations against Ms. Wrye.  (*Id*. ¶ 111).  No one spoke with Julie K., C.K.'s mother, about the allegations, either.  (*Id*. ¶ 112).  No one called CYS or the police.  (*Id*. ¶ 115). There was "a meeting about a rumor, and that's where it pretty much ended."  (*Id*. ¶ 117).

As a result, Ms. Wrye continued to have sex with C.K., about 30-40 times. (*Id*. ¶¶ 22-23).  In October 2002, C.K. dropped out of school.  (*Id*. ¶ 128).  In December 2002, Hope Wrye became pregnant by C.K.  (*Id*. ¶ 131)  Ms. Wrye resigned her employment with CIU in March 2003 because she "was ashamed and

did not want people to know . . . because of the person that I was pregnant to." (*Id.* ¶ 133).

Hope Wrye's illegal sexual relationship with C.K. "ruined [his] whole life." (*Id.* ¶ 130).

## III.   Questions Presented[3]

1.   Does the Record Contain Sufficient Evidence for C.K. to Prevail on his Title IX Claims Against CIU and POASD?

*Suggest Answer:    Yes*

2.   Does the Record Contain Sufficient Evidence for C.K. to Prevail on his Section 1983 Claims Against POASD?

*Suggest Answer:    Yes*

## IV.   Standard of Review

In reviewing CIU and POASD's Motions for Summary Judgment this Court must "vie[w] the facts from the evidence submitted in the light most favorable to [CK], and tak[e] [C.K.'s] allegations as true."  *Groman v. Township of Manalapan*, 47 F.3d 628 (3d Cir. 1995).  Summary judgment is appropriate only if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

---

[3]     C.K. does not contest CIU's Motion for Summary Judgment on the Section 1983 and punitive damages claims against CIU, so those issues are not addressed in this Brief.  Plaintiff further notes that his Amended Complaint does not actually lodge punitive damages claims against CIU, but rather only against Hope Wrye.

## V.    Argument

### a.    CIU and POASD violated Title IX by exhibiting deliberate indifference in the face of actual notice regarding sexual misconduct by Hope Wrye.

A private individual, like C.K., can enforce Title IX, 20 U.S. § 1681, and use the statute to recover monetary damages against educational intuitions like CIU and POASD.  *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992); *Warren ex rel. Good v. Reading School Dist*., 278 F.3d 163 (3d Cir. 2002). To do so, C.K. must show that (1) CIU and POASD received federal financial assistance, (2) that he was subject to discrimination on the basis of sex, and that (3) an "appropriate person" (4) had "actual notice, of, and was deliberately indifferent to, the discrimination."  *Chancellor v. Pottsgrove School Dist.*, 501 F. Supp. 2d 695 (E.D. Pa. 2007) (citing *Gebser v. Lago Vista Ind. Sch. Dist.,* 524 U.S. 274 (1998)).

Here, CIU and POASD contend C.K. cannot establish: (1) that he was subjected to discrimination on the basis of sex; (2) that such discrimination was "severe, pervasive and objectively offensive;" (3) that CIU and POASD had "actual notice" of such discrimination; and (3) that CIU and POASD were

"deliberately indifferent" to the discrimination.[4]   The facts established through discovery prove otherwise.

### 1.   Hope Wrye's sexual relationship with C.K. was discrimination on the basis of sex under Title IX.

In this case, Hope Wrye engaged in an illegal, abusive sexual relationship with C.K., beginning when he was fifteen (15) years old and legally incapable of consent to sex with Ms. Wrye, his adult teacher's assistant.  (C.K. Statement ¶¶ 20-23).  As such, there is no doubt that Ms. Wrye's conduct constitutes harassment under Title IX.

The law on this issue is clear: teacher-student sex is *per se* discriminatory under Title IX.  For example, in *Chancellor,* 501 F. Supp. 2d 695, a school district argued the student-plaintiff was not "harassed" under Title IX because the student-plaintiff "consented" to sex with a teacher.  The Eastern District of Pennsylvania rejected that argument, stating:

> **The Court . . . holds that a high school student . . . assigned to a teacher's class, does not have the capacity to welcome that teacher's physical sexual conduct.**  Under these circumstances, the teacher's conduct

---

[4]   Neither CIU nor POASD have challenged C.K. regarding whether CIU and POASD "received federal financial assistance" or whether the CIU and POASD officials who attended the meeting with Hope Wrye in 2000–2002 were "appropriate officials" for purposes of Title IX liability.  C.K. assumes that CIU and POASD agree that Chuck Young (POASD), Denny Shanafelt (CIU), and Kerri Bloom (CIU), the officials who attended the meeting with Ms. Wrye, constitute "appropriate officials" under Title IX, as they had the power to take "corrective action to address the discrimination and institute corrective measures."  *Bostic v. Smyrna School Dist*., 418 F.3d 355 (3d Cir. 2005).

is deemed unwelcomed. Unwelcome sexual conduct constitutes a sexually hostile educational environment, a form of sexual harassment. And sexual harassment constitutes discrimination on the basis of sex. **Thus, a teacher, who has sex with a high school student who is assigned to [her] class discriminates against the student on the basis of sex in violation of Title IX.**

The Eastern District's *Chancellor* decision is consistent with that of other federal courts.  *See, e.g., Gebser*, 524 U.S. at 277-78, 281 (high school student's sexual relationship with teacher is "sexual harassment");  *P.H. v. Soh. Dist. of Kansas City*, 265 F.3d 653, 659 (8th Cir. 2001) (sexual relationship between high school student and teacher is "sexual abuse"); *King v. Conroe Ind. Sch. Dist*., 2005 WL 1667803, at **1, 4 (S.D. Tex. July 15, 2005) (sexual relationship between student and teacher is "sexual harassment"); *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999) (stating same).

Here, Ms. Wrye kissed and had sex with C.K. on numerous occasions between 2000 and October 2002.  (**C.K. Statement ¶¶ 17-23**).  During large parts of that period, C.K. was assigned to Ms. Wrye's classroom.  (*Id*. ¶¶ 10-13).  As stated, such behavior by Ms. Wrye is *per se* discrimination under Title IX.

> ## 2.   Hope Wrye's sexual abuse of C.K. was "severe, pervasive, and objectively offensive" discrimination on the basis of sex under Title IX.

Hope Wrye's routine statutory sexual assaults of C.K. constituted sexual harassment "so severe, pervasive and objectively offensive, [that it] undermine[d] and detract[ed] from [his] educational experience, [such] that [he] was effectively

denied equal access to an institution's resources and opportunities." *Moeck v. Pleasant Valley School Dist.*, 179 F. Supp. 3d 442 (M.D. Pa. 2016)[5] (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)); *see also Chancellor v. Pottsgrove Sch. Dist.*, 529 F. Supp. 2d 571 (E.D. Pa.2008) (explaining the same concept).

Whether Hope Wrye's sexual harassment "rises to an actionable level is a question of fact." *Chancellor*, 529 F. Supp. 2d 571.  To determine the severity of the harassment, this Court must examine the "totality of the circumstances," including the "frequency of the conduct, its severity, whether it is physically threatening or humiliating or merely an offensive utterance and whether it interferes with the victim's performance." *Moeck*, 179 F. Supp. 3d 442.  In addition, "[w]hether [harassment] rises to the level of actionable `harassment' . . . depends on [the] surrounding circumstances, expectations, and relationships, including . . . the ages of the harasser and the victim." *Id.*

Here, there can be no doubt that Hope Wrye's illegal sexual relationship with C.K. is actionable under Title IX as "severe, pervasive, and objectively

---

[5]     In *Moeck*, this Court determined that the harassment was not severe enough to constitute a Title IX violation where the harasser engaged in "fewer than ten sexually-tinged comments over the course of two or three years."  CK.'s case is obviously much more severe, as he endured years of teacher-student statutory sexual assault.

offensive" harassment given (1) their respective ages, (2) the number of sexual encounters, and (3) the effect of Ms. Wrye's conduct on C.K.

Hope Wrye started to have sex with C.K. when she was thirty two (32) and he was only fifteen (15). (C.K. Statment ¶ 20). Given their ages and Ms. Wrye's employment, C.K. was legally incapable of consenting to sex with Ms. Wrye. Indeed Ms. Wrye committed numerous serious felony offenses when she had sex with C.K., including Statutory Sexual Assault, 18 Pa.C.S. § 3122.1(b), Involuntary Deviate Sexual Intercourse, 18 Pa.C.S. § 3123(a)(7), Institutional Sexual Assault, 18 Pa.C.S. § 3124.2(a.2), Aggravated Indecent Assault, 18 Pa.C.S. § 3125(a)(8), and Indecent Assault, 18 Pa.C.S. § 3126(a)(8).

Such criminal conduct by Ms. Wrye is "objectively offensive" by any measure. Note that Ms. Wrye committed these crimes over, and over, again. C.K. testified Ms. Wrye kissed him "every day" and had sex with him "30 or 40 times." (*Id*. ¶¶ 18, 23). Ms. Wrye eventually became pregnant by C.K. in December 2002, of which she was "ashamed" enough to quit her job. (*Id*. ¶ 133).

In addition, Ms. Wrye's sexual relationship with C.K. had a profound impact on him, his education, and his future. C.K. testified Ms. Wrye's illegal sexual relationship with him "ruined his whole life." (*Id*. ¶ 130). C.K. further testified that he dropped out of school because of his relationship with Ms. Wrye. (*Id*. ¶ 129). As a result, C.K. did not obtain a high school diploma. This is <u>exactly</u> the

harm Title IX exists to address, as Ms. Wrye's illegal conduct "deprive[d] [C.K.] of access to . . . educational opportunities or benefits."  *Chancellor,* 529 F. Supp. 2d 571.

C.K. notes that his lack of a high school diploma will be an important part of his damages case at trial.  It is common knowledge that educational attainment has a significant impact on life-time earning capacity.  C.K. will present expert testimony regarding the extent that his earning capacity is now depressed due to his dropping out of high school.

Given the above, it would be inappropriate for this Court to grant summary judgment on this issue.  A jury may readily conclude Hope Wrye's sexual abuse of C.K. was "severe, pervasive, and objectively offensive" discrimination on the basis of sex under Title IX.

### 3.    CIU and POASD had "actual notice" of Hope Wrye's intimate relationship with C.K.

To hold CIU and POASD liable under Title IX for Ms. Wrye's illegal sexual abuse, C.K. must show that CIU and POASD had "actual notice" of Ms. Wrye's sexual misconduct.  Under Title IX, CIU and POASD had "actual notice" if their officials "ha[d] knowledge of facts . . . indicating substantial danger to a student so that [CIU and POASD] can reasonably be said to be aware of the danger."  *Bostic,* 418 F.3d 355, 360-361.  "[A]ctual [notice] does not require absolute certainty that harassment has occurred."  *Swanger v. Warrior Run School Dist.,* No. 4:11-CV-

S94 (M.D. Pa. 2015). Here, there is substantial evidence of "actual notice" to both CIU and POASD regarding Ms. Wrye's misconduct with C.K.

During Ms. Wrye's tenure with CIU when she was assigned to the High School, she was called in for a meeting regarding her behavior with C.K. (C.K. Statement ¶¶ 65-72, 88-89). Officials from both POASD and CIU attended that meeting, including Chuck Young (POASD), Denny Shanafelt (CIU), and Kerri Bloom (CIU). (*Id*. ¶¶ 65, 79-107). During the meeting, Ms. Wrye testified she may have been accused of "kissing a male student." (*Id*. ¶ 72).

Then, after the meeting Ms. Wrye informed Larry Krest that she was "accused of having an affair" with a male student.[6] (*Id*. ¶ 67). Ms. Wrye further told Mr. Krest that the allegations were made by a "female cafeteria worker" that "lived close to her." (*Id*. ¶¶ 68-69). Ms. Wrye recalls this as "the Barb Neff allegation thing." (*Id*. ¶ 72).

This is consistent with the testimony of Hugh Dwyer and Barbara Neff. According to Dr. Dwyer, the meeting occurred the same day as a report from Ms. Neff, who was then Ms. Wrye's neighbor. (*Id*. ¶¶ 70-71). Ms. Neff witnessed Ms. Wrye engaged in "passionate kissing" with C.K., which concerned her. (*Id*. ¶¶ 40-41).

---

[6]   C.K. recognizes that CIU and POASD officials have since disavowed the meeting included discussion of Ms. Wrye "kissing" or "having an affair" with C.K. This dispute, however, is precisely why summary judgment is inappropriate in this case, as other testimony will contradict POASD and CIU officials' testimony.

Given these facts, a jury may well conclude that what Ms. Neff observed (Ms. Wrye passionately kissing C.K.) was reported to CIU and/or POASD officials, who then confronted Ms. Wrye.  If CIU and POASD officials were aware that Ms. Wrye was "kissing" or was "having an affair" with C.K., then the institutions had "actual notice" of her misconduct, and were arguably aware that Ms. Wrye was committing serious, illegal, sexually abusive acts with a child.  This is more than enough to indicate "substantial danger to a student." *Bostic,* 418 F.3d 355.

In fact, an allegation that Ms. Wrye was "kissing" or "having an affair" with C.K. is more "actual notice" than C.K. even needs to prevail on his Title IX claim. For example, in *Warren,* 278 F.3d 163, the Third Circuit determined that a high school principal's awareness that a teacher was taking a student to his home and engaging in physical activity "consisting of 'lifting up and down'" was sufficient to constitute actual notice under Title IX, which is a much more vague than "kissing" or an "affair."

C.K. recognizes that CIU and POASD disavow the meeting with Ms. Wrye included any discussion of Ms. Wrye "kissing" or "having an affair" with C.K. or a male student.  This, however, obviously conflicts with Ms. Wrye, Mr. Krest, Ms. Neff, and Dr. Dwyer's testimony, and the fact that Ms. Wrye was supposed to be moved to a different classroom after the meeting.  CIU and POASD's Motions and

Briefs for Summary Judgment essentially ignore this evidence.   This dispute demonstrates precisely why summary judgment is so inappropriate in this case.

Given the above, it would be inappropriate for this Court to grant summary judgment on this issue.   A jury may conclude in this case that CIU and POASD had "actual notice" of Hope Wrye's illegal sexual relationship with C.K.

>    **4.**    **CIU and POASD exhibited deliberate indifference in the face of actual notice of Hope Wrye's sexual misconduct.**

To prevail at trial, C.K. must show that "after obtaining 'actual notice' of the underlying [harassment], [CIU and POASD] exercised 'deliberate indifference' to those facts by engaging in a 'clearly unreasonable' response." *Chancellor,* 501 F. Supp. 2d 695; *see also Davis,* 526 U.S. 629 (stating that an institution is "deliberately indifferent" under Title IX where the response is "clearly unreasonable").   Here, CIU and POASD's actions after the meeting with Ms. Wrye were "clearly unreasonable" under the circumstances.

First, CIU and POASD thought Ms. Wrye's actions warranted a transfer to a different classroom.   (C.K. Statement ¶ 99).   Larry Krest, however, "whined to Denny Shanafelt" about losing Ms. Wrye, as Mr. Krest needed Ms. Wrye.   (*Id.* ¶¶ 101-103).   Ms. Wrye's proposed transfer then never occurred.   (*Id.* ¶ 100).   As a result, Ms. Wrye remained C.K.'s teacher's assistant while having sex with him. (*Id.* ¶¶ 22-23).   Obviously, Ms. Wrye was emboldened to continue having sex with C.K. knowing CIU and POASD did not take the allegations against her seriously.

Second, CIU and POASD only spoke with Ms. Wrye and Larry Krest regarding Ms. Wrye's misconduct.  (*Id*. ¶¶ 65, 100, 108).  POASD and CIU did nothing else.  No one spoke to C.K. about Ms. Wrye.  (*Id*. ¶ 111).  No one spoke with his mother about Ms. Wrye.  (*Id*. ¶¶ 112-113).  No one spoke to C.K.'s sister, who also attended the High School.  (*Id*. ¶ 114).  No further investigation was done at all.  (*Id*. ¶¶ 110, 117).

Third, Sam Peterson, POASD superintendent, had no knowledge of the allegations against Ms. Wrye.  (POASD Statement ¶ 63).  This, of course, means Principal Young did not report the information to his supervisor.

Likewise, CIU has no record of a suspension or transfer for Ms. Wrye, and no records of any misconduct on her part.  (**C.K. Statement ¶¶ 118-119**).  This fact is disconcerting given the nature of the meeting with Ms. Wrye and her planned transfer.

Finally, no one from CIU or POASD contacted the authorities regarding any allegations against Ms. Wrye.  (*Id*. ¶¶ 115-116).  No one called CYS or the police.  (*Id*.)

Dr. Charol Shakeshaft, an expert in educational administration and educator sexual misconduct, reviewed the record in this case and concluded CIU and POASD's "inaction . . . was clearly unreasonable under the circumstances." (Shakeshaft Report, Exhibit S, pg. 29).  Dr. Shakeshaft writes that CIU and

POASD "dismissed . . . notice of sexual abuse, did not investigate, did not increase supervision, and did not report to child services or the police." (*Id*. pg. 31). According to Dr. Shakeshaft, CIU and POASD "did not meet the minimum standards for prevention of sexual abuse of students in schools [which] led to the sexual abuse of [C.K.]." (*Id*. pg. 31).

Such a non-response by CIU and POASD is reminiscent of the defendant school districts' non-response in *Chancellor v. Pottsgrove School Dist.*, 501 F. Supp. 2d 695 (E.D. Pa. 2007). In *Chancellor*, the Eastern District denied summary judgment for a school district, writing that the district's response to allegations against a teacher was deliberately indifferent. *Id*. Exactly like this case, the school district "did not speak with Plaintiff" about the allegations. *Id*. Likewise, the school district did not speak with "Plaintiff's parents about the allegation." *Id*. Also, just like this case, the high school principal "did not report the allegation to…the superintendent." *Id*. In *Chancellor*, this was enough to constitute deliberate indifference.

Given the above, it would be inappropriate for this Court to grant summary judgment on this issue. A jury may conclude in this case that CIU and POASD were "deliberately indifferent" to Hope Wrye's illegal sexual relationship with C.K.

**b.    C.K.'s Section 1983 claim should proceed because POASD had a practice of not reporting criminal conduct at the High School out of fear that it would reflect poorly on the school's emotional support program, which allowed Hope Wrye's abuse of C.K. to continue.[7]**

It is well-established that students have a constitutional right to be free "from invasion of [their] personal security through sexual abuse" under the Fourteenth Amendment. *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir. 1989).   To establish liability under 42 U.S. Code § 1983 (Section 1983) with regard to a sexual abuse claim against POASD, C.K. must show: (1) that POASD's policy, practice, or custom played an affirmative role in bringing about the sexual abuse, and (2) that POASD acted with deliberate indifference to that abuse. *See id*. *Stoneking* further dictates that school officials "may not maintain a custom, practice or usage that communicate[s] condonation or authorization of" criminal behavior. *Stoneking*, 882 F.2d at 730.

This Court previously stated that C.K. adequately pled two policies, practices, or customs sufficient to support his Section 1983 claim: "not reporting to authorities known or suspected criminal activity" and "not investigating known or suspected criminal activity."  (Doc. 44, pg. 9).  Here, the record contains sufficient

---

[7]    C.K. acknowledges that the record does not contain sufficient evidence to credibly argue CIU had an institutional unconstitutional policy, practice, or custom that caused his abuse, as there is no record evidence that CIU had a prior pattern of ignoring criminal behavior like Ms. Wrye's.  As such, C.K. does not contest CIU's Motion for Summary Judgment on his Section 1983 claim against CIU.

evidence for a jury to conclude that POASD administrators had a practice of not reporting criminal conduct to the authorities, as C.K. alleged, which allowed Ms. Wrye to continue having sex with him.

Larry Krest testified that the High School principal and vice-principal consistently refused to take actions against his students for various misconduct, even where crimes were involved.   (C.K. Statement ¶ 124).   Mr. Krest once reported his student smoking marijuana to the vice-principal, who promised to call the police, but then did nothing with the information.  (*Id*. ¶ 125).   In addition, Mr. Krest was assaulted by a student, and the High School vice-principal reprimanded Mr. Krest for reporting it to the police.  (*Id*. ¶ 126).   Mr. Krest testified that POASD did not want the High School's emotional support classroom cast in a negative light. (*Id*. ¶ 127).

This practice was followed when High School principal Chuck Young did not alert authorities regarding Ms. Wrye's conduct with C.K.  (*Id*. ¶¶ 115-116). As a result, Ms. Wrye continued to have sex with C.K.  (*Id*. ¶¶ 22-23).   If the testimony of Mr. Krest is believed, then a jury may conclude that High School officials "discouraged and minimized reports of" criminal conduct, including that of Ms. Wrye.  *Stoneking*, 882 F.2d at 730.

Given the above, it would be inappropriate for this Court to grant summary judgment on this issue.  A jury may conclude in this case that POASD maintained

policies, practices, or customs that played an affirmative role in allowing Ms. Wrye to continue her abuse of C.K.

## VI.    Conclusion

C.K. has provided this Court sufficient evidence for a reasonable jury to conclude that Defendants CIU and POASD violated Title IX, and that POASD violated C.K.'s Fourteenth Amendment right to bodily integrity.  As such, C.K. requests this Court enter the attached Order denying CIU's and POASD's Motions for Summary Judgment on his Title IX claim, denying POASD's Motion for Summary Judgment on his Section 1983 claim, but granting CIU's Motion for Summary Judgment on his Section 1983 claim and punitive damages claim against CIU.

Respectfully Submitted,

**ANDREOZZI & ASSOCIATES, P.C.**

Dated: March 13, 2017           /s/ Benjamin D. Andreozzi
                                Benjamin D. Andreozzi, Esq.
                                PA ID #89271
                                ben@victimscivilattorneys.com

                                /s/ Nathaniel L. Foote
                                Nathaniel L. Foote, Esq.
                                PA ID #318998
                                nate@victimscivilattorneys.com

                                111 North Front Street
                                Harrisburg, PA 17101

717.525.9124 (Phone)
717.525.9143 (Fax)
*Attorneys for Plaintiff C.K.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C.K. | : | NO. 4:15-cv-00280-MWB |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION - LAW** |
| **HOPE WRYE,** | : | |
| **in her individual capacity,** | : | |
| **CENTRAL INTERMEDIATE** | : | |
| **UNIT #10, and PHILIPSBURG-** | : | |
| **OSCEOLA AREA SCHOOL** | : | |
| **DISTRICT** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendants** | : | |

## <u>CERTIFICATE OF SERVICE</u>

I, Nathaniel L. Foote, Esq., counsel for Plaintiff, hereby certify that a true and correct copy of the foregoing document was served upon the following counsel via this Court's electronic filing system.

Sharon M. O'Donnell, Esquire
smodonnell@mdwcg.com

Richard Polachek, Esquire
rpolachek@polacheckclarklaw.com

A true and correct copy of the foregoing document was served upon Defendant Hope Wrye by First Class Mail at the following address:

Hope Wrye
301 Hudson Street
Philipsburg, PA  16866

Respectfully Submitted,

**ANDREOZZI & ASSOCIATES, P.C.**

Dated: March 13, 2017          /s/  Nathaniel L. Foote, Esq. (PA ID 318998)
                               nate@victimscivilattorneys.com
                               111 N. Front Street, Harrisburg, PA  17101
                               Ph: 717.525.9124 | Fax: 717.525.9143