# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C.K., | No. 4:15-CV-00280 |
| Plaintiff. | Judge Brann |
| v. | |
| HOPE WRYE, CENTRAL INTERMEDIATE UNIT #10, AND PHILIPSBURG-OSCEOLA AREA SCHOOL DISTRICT, | |
| Defendants. | |

## MEMORANDUM OPINION

### NOVEMBER 7, 2017

Defendants Central Intermediate Unit #10 ("CIU") and the Philipsburg-Osceola Area School District ("POASD") filed motions for summary judgment against Plaintiff, C.K.[1] For the reasons that follow, their motions are granted.

## I. BACKGROUND

### A. C.K.'s Relationship with Hope Wrye

In the fall of 2000, C.K. enrolled as a student in Larry Krest's emotional support class at the POASD High School.[2] Defendant Hope Wrye was Mr. Krest's assistant in that class.[3]

---

[1] ECF Nos. 59 and 61.

C.K. remained in Mr. Krest's class until February 2001, when he transferred to another school district.[4] A few months later, in November 2001, C.K. transferred back to POASD, where he remained until dropping out completely in October 2002.[5]

During this period, while still a minor, C.K. began a sexual relationship with Ms. Wrye. Although the parties disagree about when, exactly, the sexual relationship began, it is undisputed that Ms. Wrye eventually became pregnant with C.K.'s child, who was born in September 2003.

Also during this period, several CIU and POASD officials held a meeting with Ms. Wrye about her personal relationships with students at the school – and possibly about her personal relationship with C.K. The parties and various witnesses give disparate accounts of this meeting, which will be discussed *infra*.

### B. Procedural History

C.K. instituted this action by filing a complaint in February 2015,[6] and on October 9, 2015, C.K. filed his Second Amended Complaint, which contained five

---

[2] ECF No. 60 ¶¶ 1,2; ECF No. 73 ¶¶ 1,2.
[3] *Id.*
[4] *Id.*
[5] ECF No. 60 ¶¶ 3, 5; ECF No. 73 ¶ 3, 5.
[6] ECF No. 1.

counts.[7] In Count II, brought under 42 U.S.C. § 1983, C.K. alleged that his "inappropriate" relationship with Ms. Wrye violated his constitutional right to bodily integrity, and that his injuries were the "direct and proximate result" of a policy or custom of CIU and POASD.[8] In Count III, brought under 20 U.S.C. § 1681 (*i.e.*, "Title IX"), C.K. alleged that this relationship "created a sexually hostile educational environment, and unreasonably interfered with C.K.'s educational opportunities."[9]

On February 6, 2017, CIU and POASD moved for summary judgment on Counts II and III, arguing that C.K. is unable to produce sufficient evidence to prevail on his claims at trial.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the

---

[7] ECF No. 38.

[8] *Id.* ¶¶ 43-50.

[9] *Id.* ¶¶ 51-56.

Counts I, IV, and V were brought against Ms. Wrye only, so they will not be addressed here.

[10] Federal Rule of Civil Procedure 56(a).

case."[11] To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[12] When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[13]

### B. Claim under Title IX

Section 1681(a) of Title 20 of the United States Code – "Title IX" – states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance . . . ." In order to prevail against a school on a sexual harassment claim, a plaintiff needs to show, *inter alia*, that an "appropriate person" at the school had "actual notice of . . . the teacher's misconduct."[14] Here, C.K. has failed to produce enough evidence to allow a jury to find that an "appropriate person" at CIU or POASD had "actual notice" of his relationship with Ms. Wrye.

C.K. bases his argument on this point entirely on the aforementioned meeting between school officials and Ms. Wrye. At the outset, it is unclear who, exactly, attended this meeting. The conflicting evidence shows that, besides Ms.

---

[11] *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[12] Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[13] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[14] *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277 (1998).

Wrye, it may also have been attended by Charles Young (principal of the POASD High School),[15] Gary Springer (special education supervisor at POASD),[16] Dennis Shanafelt (special education director at CIU),[17] and Kerri Ann Bloom (special education supervisor at CIU).[18] Since, at this stage, this Court must draw all reasonable inferences in favor of C.K., it will assume that all these officials were in attendance. Evidence about the exact timing of this meeting is also imprecise, but the Court will assume that it occurred while Ms. Wrye was employed at the school and while C.K. was enrolled there as well.

More important than attendance and timing of this meeting is what was discussed in it; the officials who were involved in it, however, remember very little about its substance. In his deposition testimony, Mr. Young indicated that "the meting proceeded by bringing [Ms. Wrye] in and informing her of a rumor that had come to light with regard to her providing rides or being in a vehicle with C.K."[19] Mr. Young has no recollection of discussing anything else regarding Ms. Wrye's relationship with C.K., *e.g.*, whether anyone had observed any romantic or sexual behavior between Ms. Wrye and C.K.[20] Similarly, Mr. Springer recalls that the

---

[15] Young Dep. at 11, 14.

[16] Springer Dep. at 16, 41.

[17] Shanafelt Dep. at 13, 40.

[18] Bloom Dep. at 13, 19-20.

[19] Young Dep. at 15.

[20] *Id.* at 18, 29.

topic of the meeting was "grapevine hearsay that . . . an aide . . . had been giving students a ride in her personal vehicle after school hours."[21] Like Mr. Young, he cannot recall hearing anything about a sexual or romantic relationship between Ms. Wrye and C.K.[22] Mr. Shanafelt remembers that "there were rumors that there was an issue between" Ms. Wrye and C.K., or a "rumor that there might be something between" the two of them, but his deposition testimony is no more specific than that.[23] Ms. Bloom remembers a "gossipy report" that "said that [Ms. Wrye] and this student were friends, were something," and that the report involved someone "see[ing] this student in [Ms. Wrye's] car . . . and also at her home."[24] Ms. Bloom recalls "a report . . . of [Ms. Wrye] in an inappropriate relationship with a student," but does not remember any facts "which would support a purported inappropriate relationship" between the two.[25]

Ms. Wrye's testimony contains scarcely any more detail. She remembers someone "from [CIU or POASD] questioning [her] about an inappropriate relationship with a student," but cannot remember being questioned about her relationship with C.K.[26] She claims that someone at the meeting "said that they

---

[21] Springer Dep. at 24.

[22] *Id.* at 29, 34 ("I did not hear anyone connecting Hope Wrye and C.K. in any way other than a professional situation other than the rides that were given earlier.").

[23] Shanafelt Dep. at 40-41.

[24] Bloom Dep. at 22, 27.

[25] Bloom Dep. at 27, 29.

[26] Wrye Dep. 105-06.

had received an accusation that someone – I don't exactly recall what it was . . . that someone saw me with a student or kissing a student,"[27] but pressed further, she could not recall whether anyone actually asked if she had kissed a student,"[28] and did not suspect that the officials were referring to her relationship with C.K.[29]

Ms. Wrye spoke to Mr. Krest after this meeting.[30] With respect to that conversation, Mr. Krest remembers later telling someone that Ms. Wrye said "the principal accused her of having an affair with one of her students,"[31] but questioned at his deposition, he simply remembers that Ms. Wrye told him that "an accusation had been made."[32] He does not remember C.K.'s name being mentioned.[33]

Ms. Wrye's testimony mentions a "Barb Neff allegation thing."[34] Barbara Neff was a food services employee at POASD who lived near Ms. Wrye at the time of the underlying events.[35] She claims that C.K. spent "many evenings and weekends" at Ms. Wrye's home and claims to have observed "outwardly

---

[27] *Id*. at 106-07.

[28] *Id.* at 108.

[29] *Id.* at 107.

[30] *Id.* at 115.

[31] Krest Dep. at 45.

[32] *Id.* at 45-46.

[33] *Id.* at 49.

[34] Wrye at 107.

[35] Neff Dep. at 18, 32.

inappropriate behavior between" Ms. Wrye and C.K., including "physical contact, kissing, [and] hugging," some of which was "passionate."[36] Although she recalls reporting this behavior to a physical education teacher at the school, she does not recall reporting it to "an authority or to the principal."[37] None of the officials questioned could recall speaking with Ms. Neff, either.[38] Mr. Krest indicated that Ms. Wrye told him that the accusations against her were made by a "female cafeteria worker," but could not identify Ms. Neff's name when prompted.[39]

Unfortunately for C.K.'s case, no reasonable trier of fact could, on this evidence, find that an appropriate person at either CIU or POASD had actual notice of Ms. Wrye's misconduct. The officials can remember, at most, hearing that Ms. Wrye and C.K. were driving home together after school and possibly visiting each other outside school hours. Mr. Young and Mr. Springer specifically deny remembering that there was any sexual or romantic behavior between Ms. Wrye and C.K.; Ms. Bloom cannot recall any facts "which would support a purported inappropriate relationship" between the two; and Mr. Shanafelt can only remember hearing about "something between" them.

---

[36] *Id*. at 37-39.

[37] *Id.* at 40-41.

[38] Young Dep. at 29; Springer Dep. at 37; Shanafelt Dep. at 46-47.

[39] Krest Dep. at 49-50.

Before this Court, C.K. points to Ms. Wrye's recollection of being questioned at the meeting about an "inappropriate relationship," but Ms. Wrye specifically denied remembering being questioned about her relationship with C.K. She did state that perhaps someone saw her "with a student *or* kissing a student," but also could not actually remember being asked about kissing a student. Mr. Krest's recollections are similarly too vague and amorphous to support a finding that any CIU or POASD official had actual knowledge of any of Ms. Wrye's alleged misconduct. And finally, although it is undisputed that Ms. Neff observed inappropriate behavior and reported it to *someone*, C.K. does not argue here that the school's physical education teacher was an "appropriate person."

C.K.'s Title IX claim, then, must fail.

### C. Claim Under 42 U.S.C. § 1983[40]

Section 1983 of Title 42 of the United States Code provides a means by which individuals may recover for violations of their constitutional rights. The statute, however, does not allow recovery under a *respondeat superior* theory of liability.[41] Therefore, when a plaintiff attempts to recover from a municipal entity like CIU or POASD, he must show that his injuries were the result of a policy or

---

[40] In his Brief in Opposition to POASD's and CIU's Motions for Summary Judgment, C.K. concedes that there is insufficient evidence for his § 1983 claim again CIU to survive. ECF No. 71 at 23-24. Therefore, judgment will be entered in favor of CIU on that claim.

[41] *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).

custom of the municipality.[42]  Further, there must be a "direct causal link between the municipal action and the deprivation of federal rights."[43]

If "the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with *deliberate indifference* as to its known or obvious consequences."[44]  "Deliberate indifference" is "something more culpable . . . than a negligent failure to recognize a high risk of harm to [the] plaintiff[]."[45]  To prevail on a "deliberate indifference" claim, a plaintiff must show "that the defendant knew of the risk to the plaintiff

---

[42] *Id.* at 694 ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

[43] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (noting that the plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (emphasis in original).

[44] *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3rd Cir. 2000) (internal quotation marks and citation omitted) (emphasis added).  *See also Natale v. Camden County Correctional Facility*, 318 F.3d 575, 584 ("There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under §1983.  The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Finally a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.") (internal quotation marks and citations omitted).

[45] *Black by Black v. Indiana Area School District*, 985 F.2d 707 (3rd Cir. 1993).

before the plaintiff's injury occurred."[46] When a case is brought against school officials and involves alleged sexual abuse by a school employee, there must be "credible evidence demonstrating that school officials knew of the alleged risk of sexual abuse posed by [the employee] at a time at which they could have prevented [the] alleged injuries."[47]

C.K. cannot prevail on a "deliberate indifference" § 1983 claim for the reasons discussed *supra* in § II.B – *i.e.*, he has failed to show that any officials had knowledge of the relationship between C.K. and Ms. Wrye "at a time at which they could have prevented [C.K.'s] alleged injuries." C.K. also alleges that POASD had a "practice of not reporting criminal conduct at the High School out of fear that it would reflect poorly on the school's emotional support program."[48] To show this "practice," he notes that Mr. Krest, in deposition, testified (1) that POASD failed to contact the police after a student was caught smoking marijuana in a school restroom, and (2) that a POASD official was "upset" after Mr. Krest reported a student assault to the police.[49] Assuming this is sufficient evidence, at this stage, to find such a practice existed, C.K. has failed to show the requisite causal link between this practice and his alleged injury. Although he argues that this practice

---

[46] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 137 (3rd Cir. 2001).

[47] *Johnson v. Elk Lake School District*, 283 F.3d 138, 144 n.1 (3rd Cir. 2002).

[48] ECF No. 71 at 22.

[49] Krest Dep. at 74-76.

"allowed [Ms.] Wrye's abuse of C.K. to continue,"[50] he fails to show exactly how. There is no evidence, for example, of Ms. Wrye being aware of this alleged practice such that she became emboldened and consciously took advantage of it.[51]

C.K.'s § 1983 claim, likewise, must fail.

## III.  CONCLUSION

C.K. has not produced sufficient evidence to allow a jury to find in his favor on his Title IX claims against POASD and CIU.  He has likewise not produced sufficient evidence to allow a jury to find in his favor on his § 1983 claim against POASD, and has conceded that claim against CIU.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[50] ECF No. 71 at 22.

[51] C.K. argues that the alleged practice "was followed when [Mr. Young] did not alert authorities regarding Ms. Wrye's conduct with C.K."  ECF No. 71 at 23.  This conflates the analysis between, on the one hand, showing that an alleged policy was the "moving force" behind his injury and, on the other, showing that school officials were deliberately indifferent to the relationship between C.K. and Ms. Wrye.